IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


JOHN SMITH,
FDOC No. 749343,
     Petitioner,

vs.                       Case No.:  4:15cv374/RH/EMT

DEPARTMENT OF CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 18).  Petitioner filed a reply (ECF No. 25).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.       BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 18).[1]  Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2008-CF-4102, with two counts of armed robbery with a firearm (Ex. C at 13).  Following a jury trial, he was found guilty as charged (Exs. E, G).  On November 1, 2011, Petitioner was sentenced to concurrent terms of life imprisonment, with a ten-year mandatory minimum and pre-sentence jail credit of 1,073 days on each sentence, to run consecutive to Petitioner's sentence on federal charges (Exs. H, I).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-6202 (Ex. K).   Petitioner's counsel filed a brief, pursuant to <u>Anders v. California</u>, 386 U.S. 738 (1967), asserting that there were no meritorious arguments to support the contention that reversible error occurred in the trial court (Ex. K).  Petitioner filed a pro se initial brief (Ex. L).  The

--------

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 18).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

First DCA affirmed the judgment per curiam without written opinion on August 16,
2012, with the mandate issuing September 11, 2012 (Ex. N).  Smith v. State, 95 So.
3d 220 (Fla. 1st DCA 2012) (Table).

On June 24, 2013, Petitioner filed a petition for writ of habeas corpus in the
First DCA, alleging ineffective assistance of appellate counsel, Case No. 1D13-3113
(Ex. O).  The First DCA denied the petition on the merits on July 19, 2013 (Ex. P).
Smith v. State, 117 So. 2d 481 (Fla. 1st DCA 2013) (Mem).

On September 10, 2013, Petitioner filed a motion for post-conviction relief,
pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. Q).  The
circuit court appointed counsel for Petitioner and held an evidentiary hearing (Exs. W,
X).  The circuit court denied the Rule 3.850 motion on March 19, 2014 (Ex. Y).
Petitioner appealed the decision to the First DCA, Case No. 1D14-1286 (Exs. Z, AA).
The First DCA affirmed the decision per curiam without written opinion on April 23,
2015, with the mandate issuing May 19, 2015 (Ex. CC).  Smith v. State, 162 So. 3d
993 (Fla. 1st DCA 2015) (Table).

On July 28, 2014, while the Rule 3.850 motion was pending, Petitioner filed a
motion to correct sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal
Procedure (Ex. DD).  The circuit court summarily denied the motion on August 21,

2014 (Ex. EE).  Petitioner appealed the decision to the First DCA, Case No. 1D14-4534 (Ex. GG).  The First DCA affirmed the decision per curiam without written opinion on January 14, 2015, with the mandate issuing March 17, 2015 (Ex. CC).  Smith v. State, 163 So. 3d 1186 (Fla. 1st DCA 2015) (Table).

Petitioner filed the instant federal habeas action on July 21, 2015 (ECF No. 1).

## II.   STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  "Clearly established Federal law, includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions." <u>Woods v. Donald</u>, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation omitted).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" <u>Lockyer</u>, 538 U.S. at 73 (quoting <u>Williams</u>, 529 U.S. at 405–06).  The Supreme Court has clarified that

"[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. However, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is

"whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. See Gill, supra at 1291 (citing Richter). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask

whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* <u>Richter</u>, 562 U.S. at 102; *see also* <u>Gill</u>, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").   The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* <u>Panetti v. Quarterman</u>, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.   PETITIONER'S CLAIMS

   A.   <u>Ground One</u>:  <u>"Post conviction evidentiary [sic] appointed counsel Mr. Robert Morris rendered ineffective assistant [sic] by failing to properly prepare for factual hearing, specifically, counsel was informed of the need to secure vital witness (dispatcher) to testify, which could had [sic] conclusively proved my Giglio claim, but deliberately failed to do so."</u>

Petitioner alleges one of his post-conviction claims was that the prosecutor knowingly presented false testimony at trial, specifically, testimony of Officer Clark that he received a dispatch to Mission Road on November 24, 2008 (ECF No. 1 at 5–7).[3]  Petitioner claims that his post-conviction counsel, Attorney Robert Morris, was ineffective for failing to present testimony from Dispatcher #137 of the Tallahassee Police Department (*id.*).  Petitioner contends that counsel's failure to present the

---

   [3] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

testimony of the dispatcher prevented Petitioner from successfully challenging the State's witness at the post-conviction evidentiary hearing (*id.*).

Respondent contends Petitioner's free-standing claim of ineffective assistance of post-conviction counsel does not present a cognizable basis for federal habeas relief (ECF No. 18 at 18–20).

In Petitioner's reply, he contends his claim is cognizable, pursuant to Martinez v. Ryan, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) (ECF No. 25 at 1–4).

Petitioner's reliance on Martinez is misplaced.   As the Eleventh Circuit explained, "Martinez  did not . . . create a freestanding claim for challenging a conviction or sentence based on the alleged ineffective assistance of state post-conviction counsel."   Lambrix v. Sec'y Fla. Dep't of Corr., 756 F.3d 1246, 1262–63 (11th Cir. 2014) (footnote omitted).   Petitioner's claim of ineffective assistance of collateral counsel is not a cognizable basis for federal habeas relief.  *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.); *see also* Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987) (prisoners have no constitutional right to counsel when collaterally attacking their convictions); Barbour v. Haley, 471

F.3d 1222, 1227–29 (11th Cir. 2006) (same).  Petitioner is therefore not entitled to relief on Ground One.

      B.    <u>Ground Two:  "Ineffective assistant [sic] of counsel by failing to object and/or move for a mistrial based on prosecution counsel violated [sic] pre-trial motion of [sic] limine that prohibited mentioning of a firearm that would infer connection to Defendant."</u>

Petitioner alleges the trial court granted defense counsel's motion in limine to exclude all evidence of other crimes or prior convictions (ECF No. 1 at 7; ECF No. 25 at 4–6).  Petitioner alleges during opening statements at his trial on October 28, 2011, the prosecutor told the jury that on November 24, 2008, Officer Clark found Petitioner in possession of a semi-automatic pistol (*id.*).  Petitioner alleges his possession of the pistol was conduct underlying his prior federal convictions, on July 17, 2009, for possession of a firearm by a convicted felon and possession of a stolen firearm, in <u>United States v. Smith</u>, No. 4:09cr15/RH/EMT (N.D. Fla. July 17, 2009) (*id.*).  Petitioner contends defense counsel should have objected to the prosecutor's reference, on the ground that it violated the court's ruling on the motion in limine (*id.*).  Petitioner asserts he presented this claim as Ground One of his Rule 3.850 motion (ECF No. 1 at 7).

Respondent states that "it appears" Petitioner satisfied the exhaustion requirement of § 2254(b)(1); however, "[i]n an abundance of caution," the State does

not concede or waive the exhaustion defense (ECF No. 18 at 27 n.6).  Respondent contends the state court's adjudication of this ineffective assistance of counsel ("IAC") claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based upon an unreasonable determination of the facts (*id.* at 20–32).

#### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was "reasonable considering all the circumstances."  Strickland, 466 U.S. at 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the

performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed,

"'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788.  As the Richter Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

### 2.   Federal Review of State Court Decision

Petitioner was charged with two counts of armed robbery with a firearm, based upon robberies of two individuals on November 23, 2008 (Ex. B at 13).  The amended information charged that Petitioner carried and actually possessed a firearm during each of the robberies (*id.*).  On December 18, 2008, Petitioner was charged in a separate state case, Case No. 2008-CF-4103, with one count of possession of a firearm by a convicted felon, one count of grand theft of a firearm, and one count of resisting an officer without violence, based upon conduct that occurred on November 24, 2008, the day after the armed robberies (Ex. JJ).  The State dismissed Case No. 2008-CF-4103, because the crimes were successfully prosecuted in this federal court, Case No. 4:09cr15/RH/EMT (N.D. Fla. July 17, 2009) (Ex. KK).

Prior to Petitioner's trial on the armed robbery charges, defense counsel filed a motion to limine seeking to exclude "any mention of any charges not set forth in the information or any alleged crimes not charged" (Ex. D).   The motion was heard immediately prior to the presentation of evidence at Petitioner's trial on October 28, 2011:

> MR. EAGEN [defense counsel]:  The other issue is I did file a motion in limine.  Basically, it's my standard motion in limine to keep out any other criminal history or any other charges not contained in the information.  Mr. Campbell [the prosecutor] indicates that he has no objection to it.    And I assume he has instructed his witnesses accordingly.
>
> THE COURT:  Is that correct, Mr. Campbell?
>
> MR. CAMPBELL:  Yes, sir.  The witnesses, the other officers, there's not going to be any mention of any other criminal history or records.  And specifically he mentioned when he was first contacted by the police that he had some marijuana on his person.  We're not going to talk about that at all.
>
> The officers are hearing me say that again.
>
> THE COURT:  I assume the witnesses all understand that?
>
> MR. CAMPBELL:  Yes, sir.
>
> THE COURT:  All right.  I'll grant that motion in limine then.  If that changes, bring it to my attention outside the presence of the jury.

(Ex. E at 4–5).

The theory of defense presented at trial was misidentification.  Prior to opening statements, the trial court <u>twice</u> instructed the jury that the lawyers' statements during opening statements did not constitute evidence, and the jury should not consider the lawyers' statements as such (Ex. E at 9, 15–16).  The prosecutor's opening statement was the following:

> Ladies and gentlemen of the jury, on November 23, 2008, almost three years ago, there was a group of students living in Timber Wood Apartments here in Tallahassee, Florida.

> You're going to hear on that evening at about 10:00 at night, Kristopher Hekaros and the two Kyles, Kyle O'Brien and Kyle Abraham, all lived together in one apartment, that there was a little space and in an adjacent unit they had a friend named Paul Mazzei, who lived with some friends there.

> You're going to hear that Kristopher Hekaros first started noticing a group of men standing out in front of Paul's apartment, didn't recognize these guys, didn't know what they were doing.  It kind of raised his suspicions and concerns, so he's kind of keeping an eye on them, standing in the parking lot, and calls Paul and says, hey, there's some guys standing outside in front of your apartment.

> You're going to hear Paul Mazzei was driving back from going out to dinner with his girlfriend when he got the call, but that he arrived shortly thereafter.

> Kristopher is still watching them.  He goes back inside his apartment and mentions to his roommates, Kyle Abraham and Kyle O'Brien, hey, this is what's going on, keep an eye on it, and walks back over and starts kind of walking over to Paul's house.  As he does so, a man steps out of the shadows and points a gun at him.

You're going to hear that the man pointed the gun at him and quickly three or four other men surrounded him, all brandishing firearms and demanding that he give them the keys to his apartment and let them go into his apartment.

Fortunately, Kyle O'Brien and Kyle Abraham see this start happening, see the thing.  You're going to hear that at gunpoint Mr. Hekaros surrenders his house key, but O'Brien and Abraham are behind the door not letting them come in as they try to force themselves into Kristopher Hekaros' apartment.

About this time, Paul Mazzei is getting home.  He tells his girlfriend to go ahead in.  He starts walking over to find Kristopher Hekaros in the middle of this robbery.  He says, hey, what's going on, words to that effect, try to break it up.  The gunmen then turn their attention to him and Kristopher Hekaros is able to flee.

You are going to hear that at that point Paul Mazzei is held at gunpoint.  He ends up surrendering his wallet, his cell phone, US currency, and other things to the gunmen.

You're going to hear—by this point, of course, the Kyles are still inside.  There's hollering in the parking lot.  Hey, police, police. Hekaros is running away, trying to get police, and the gunmen flee.

You're also going to meet Christopher Vogel, a friend of Paul Mazzei, who was there trying to pick up Paul's roommate to give him a ride to his girlfriend's house down the way and that he was standing there watching this robbery take place.

You're going to hear that Christopher Vogel actually is able to, because he's sitting in his car watching it, he starts to follow the group of gunmen and follows it to an apartment complex called Mission West, where he believes that they have become wise to the fact that he's following them.  One of the men gets out of the car and brandishes what he believes is a gun.  So he drives quickly away and leaves the scene.

You're going to meet officers of Tallahassee Police Department who respond initially to that call.  I anticipate that David Covan is going to come, they start taking reports, start taking written statements of each of them, trying to figure out who robbed them.

Now, you're going to hear that Mr. Vogel goes back and tells his friend, Hekaros, hey, I followed the guys to this location and the next day Mr. Hekaros gets in his vehicle and drives over to the area of Stratford Landing Apartments, Mission West, as they are adjacent apartment complexes about a mile, mile and a half away from the crime scene, and that he sees a man he recognizes there.  He sees the defendant.

He immediately calls Tallahassee Police Department, says, hey, I think I see the guy who robbed me last night, can you send officers, and Tallahassee Police does just that.  Officer Clark responds to that area.  He finds a man who matches the description that Mr. Hekaros has given to the dispatcher, what he's wearing, what he looks like, and immediately makes contact with the defendant.

You're going to hear that now Investigator Beck is assigned to the investigation, they now have a possible suspect.  Photographic lineups are prepared and are shown to these men who were witnesses and victims.  You're going to hear that Kris Hekaros immediately picks out the defendant as the person in the photographic lineup who had robbed him and put that gun in his belly the night before.

By this time, they go back, once again, Officer Clark makes contact with the defendant and finds him in possession of a semi-automatic pistol.

Ladies and gentlemen, this is the evidence that the State of Florida is going to bring to you.  It's going to show that the group of people working as a team worked together to rob some college students, that they successfully robbed one person of a key.

Now, the key's significance is that would have allowed them access to the apartment, but for his roommates holding that door.  But the key is enough.  The key has value.  And they successfully do an armed robbery of Kristopher Hekaros.

You're also going to hear that they also at gunpoint robbed Paul Mazzei of his personal belongings.  You're going to hear that that crime was committed in Leon County and that the identity of one of this group has been proved and established both by photographic lineup, by Kristopher Hekaros picking him out of the world in general and spotting him, and I anticipate that by these witnesses being able to come in and tell you here today that is the man who robbed me.

This is the evidence that the state will bring.  And after listening to it, it will prove beyond any reasonable doubt that John Smith is guilty as charged of two counts of armed robbery with a firearm.

(Ex. E at 16–21 (emphasis added)).

Defense counsel's opening statement was the following:

An opening statement is an overview of the anticipation of what we, as attorneys, expect you to hear during the trial.  I often compare opening statement to the preview of a football team, when the coaches tell us how FSU is going to be number one.  Things don't always work out the way the coaches plan.  Players don't perform up to expectation, they're injured, or there are just things that don't turn out the way we anticipate them to turn out and we don't become National Champions. A trial is the same way.

There was an incident that occurred on November 23 at the apartment, as the State has said.  Later on, there's an identification of Mr. Smith as being one of the possible people involved in that incident. The evidence will show and the anticipation is that that identification may not live up to the expectations, may not perform as expected, that there are injuries or there are flaws in the evidence in the State's case.

When all is said and done, the defense is confident that you will
find Mr. Smith not guilty of these crimes.

(Ex. E at 21–22).

The State presented the following evidence at trial.   Kristopher Hekaros

testified that at 8:00 p.m. on November 23, 2008, he called his neighbor, Paul, because

he observed people "hanging out" in front of Paul's townhouse, and it did not look

"normal" (Ex. E at 22–46).   Mr. Hekaros testified that he went outside, and as he was

walking toward Paul's townhouse, Petitioner, who he did not know prior to that night,

came around the corner with a gun and put it to his (Hekaros') stomach.   Hekaros

testified that the gun was a semi-automatic pistol.   Hekaros testified that he still had

his keys to his townhouse in his hand, and the man started pushing him back toward

the front door, telling him to get back inside the townhouse or let him (the man with

the gun) inside the townhouse.   Hekaros testified that the man demanded his keys, so

he gave them to him.   Hekaros testified that he left his cell phone in the townhouse.

Hekaros testified that as the man pushed him toward his townhouse, he attempted to

alert his roommates, who were inside the townhouse, by creating noise outside.

Hekaros testified that approximately four more men were approaching him at the same

time that Paul drove up.   He testified that the gunman and the other men turned their

attention to Paul, so he (Hekaros) ran.   Hekaros testified that he looked back, and saw

Paul giving the contents of his pockets to one of the men.  Hekaros testified that the man who had put a gun to his stomach was there with Paul, but Hekaros did not believe that the man was the person who actually robbed Paul.  Hekaros testified that his friend Chris Vogel had been waiting in his car in the parking lot to give Hekaros a ride to his girlfriend's house, and Hekaros saw Vogel follow the car that the men left in.  Hekaros testified that Vogel told him that he followed the car to the Mission West Apartments.  Hekaros testified that he went there the next day to try to find the robbers.  Hekaros testified that the man who put a gun to his stomach was a middle-aged African-American male with a scruffy beard and wearing a "skull cap."  He testified that he saw the man at the Mission West Apartments, and called the police.  Hekaros testified that he described the man's location and appearance to police.  Hekaros testified that shortly thereafter, he went to the police department and was shown a series of photographs of African-American men.  Hekaros testified that he recognized a photograph of the man who put the gun to his stomach, and identified the photograph to a police officer.  Hekaros identified the photographic line-up from which he identified the gunman, and it was admitted into evidence.  Hekaros also identified Petitioner in court as the man who held a gun to his stomach and took his keys.

On cross-examination, Mr. Hekaros testified that he could not remember in which hand the gunman held the gun.  He testified that he was nervous and scared, and that it was dark outside.  Hekaros testified that he described the gunman to police on the night of the robbery as a black man with a scraggly beard and wearing a skull cap, but he was not shown any pictures that night.

Kyle Abraham testified that in 2008, he lived with Kristopher Hekaros and Kyle O'Brien (Ex. E at 47–56).  Mr. Abraham testified that when Kris left the townhouse on the night of November 23, 2008, he (Abraham) heard voices and looked through the peephole of the door.  Abraham testified that he saw a black male talking to Kris and pointing a gun at his stomach.  Abraham testified that the black male took Kris' keys and was trying to unlock the townhouse door, but Abraham was holding the deadbolt from the other side.  Abraham testified that he was able to see what the black man looked like.  Abraham testified that he viewed a photographic line-up the next day, and was "pretty sure," but not positive, that one of the photographs was the man who pointed a gun at Kris.  Abraham testified that the man in the photograph had more weight in his face than the man outside the door. Mr. Abraham identified Petitioner in court as the man who held a gun on Kris and attempted to get into their apartment.

On cross-examination, Mr. Abraham admitted that Petitioner was the only black man sitting at the table with defense counsel.  He testified that he remembered that the man had a skinny face and a scruffy beard, and was wearing a black hat.

Kyle O'Brien testified that he was in the apartment playing video games on the night of November 23, 2008 (Ex. E at 56–66).  He testified that he heard noise outside, and when he looked out, he saw four or five black persons standing over his roommate Kris, holding him on the ground with guns.  O'Brien testified that one of the men took Kris' keys and tried to open the door to the townhouse.  He testified that he held the deadbolt while Kyle Abraham called the police.  Mr. O'Brien testified that he was not able to identify anyone who participated in the robbery.

Paul Mazzei testified that he was living at the Timbers townhouses in November 2008 (Ex. E at 67–83).  Mazzei testified that while he was on his way home from dining out on November 23, 2008, he received a phone call from a neighbor.  Mazzei testified that he arrived home and told his girlfriend to go inside, while he went to the neighbors' townhouse to make sure everything was okay.  Mazzei testified that his girlfriend went inside and locked the door.  Mazzei testified that he walked behind a couple of cars to approach Kris' house, and saw five people kneeling down with guns.  He testified that one of the men pointed a gun in his face and told him to

give him everything from his pockets, so he gave the man his phone and wallet. Mazzei testified that each of the men had a gun, and they were black semi-automatic handguns. Mazzei testified that in the days that followed, he was shown photo line-ups by the police. He testified that he initialed one of the photographs in one of the line-ups, but the photograph was not of Petitioner. The line-up was admitted as Defense Exhibit 3. Mr. Mazzei identified Petitioner in court as one of the men who held a gun on him, but testified that Petitioner was not the man to whom he gave his wallet and phone.

Christopher Vogel testified that on the evening of November 23, 2008, he was planning to give Kris Hekaros a ride to his girlfriend's house (Ex. E at 84–94). Vogel testified that he was in his car waiting for Kris, and saw Kris come out of his townhouse. Vogel testified that as Kris was walking to the car, Vogel saw Paul Mazzei arrive in his car with his girlfriend and another friend. Vogel testified that five men "bum-rushed" Kris, Paul, Paul's girlfriend, and Paul's friend, and forced them to the ground. Vogel testified that the men took wallets and money, and then left in two cars. Vogel testified that one of the men was tall and thin, with dreadlocks and a "beanie" on his head. Vogel testified that this man took Kris Hekaros' cell phone. Vogel testified that he followed the cars to the Mission West apartment complex.

Vogel testified that when he turned right into the apartment complex to follow the cars, there was a man with a gun blocking his entry, so he left.  Vogel testified that he returned to the Timbers and told police and Kris Hekaros that he followed the cars to the Mission West complex.  Mr. Vogel testified that he never identified any of the men who participated in the robberies.

Investigator David Covan testified that he responded to the Timbers on November 23, 2008, in response to a dispatch of a possible robbery in progress (Ex. E at 95–102).  Covan testified that he took statements from witnesses at the scene, and then the case was turned over to Detective Beck.

The State called Officer Doug Clark as its next witness, but prior to his testimony, defense counsel requested a bench conference.  The following discussion occurred at the bench:

> MR. EAGEN:  Your Honor, I'm a little concerned.  From what I gather from the opening statement, if Officer Clark is going to testify concerning—I don't know, did Officer Clark encounter this gentleman just once or—
>
> MR. CAMPBELL:  Twice.
>
> MR. EAGEN: Twice? I'm a little concerned because of the ruling on the motion in limine, the discussion about the gun being seized at the time of the arrest, and we don't have the gun here.  It just creates speculation about a gun.

Obviously, he was charged in another crime with possession of that firearm, which has been ruled—we ruled to keep that out under a motion in limine.  So, before we get into this witness and it happens, I wanted to address it with you.

THE COURT:  We ruled that we weren't going to get into any other crimes.  What do you expect from this witness, Mr. Campbell?

MR. CAMPBELL:   He did have two interactions with the defendant the following day pursuant to the victim, Mr. Hekaros, calling in.  The first time he made contact, identified him.  And that's all we're going to say is that he made contact with him at that location, at the Mission West Apartment.

Later he was asked to go and get him.  When he made contact with him the second time, he was taken into custody and found to be in possession of a semi-automatic pistol.

That's it.  I'm not going to talk about his status as a felon or the fact that he had any marijuana on him.  That's all irrelevant.  Just the fact that he possessed a pistol, not that he criminally possessed a pistol.

THE COURT:  How are we going to connect this pistol with what occurred in this robbery?

MR. CAMPBELL:  Other than the—the only thing is that it's consistent with being a semi-automatic pistol, as the victims have said that the defendant possessed a semi-automatic.  The next following day this man was in possession of a semi-automatic pistol.  That's the only connection I have, Your Honor.

MR. EAGEN:  But no one has identified this pistol.  It was never shown to any of the victims and identified as the pistol in question.  And the pistol is not here.  I think the prejudicial effect is just extreme, Your Honor.  To say that—I don't know the fact that he was taken into custody is one thing and that's fine.  But the fact that they say that he had

an automatic, I mean the suggestion to the jury is this is the gun that was involved in that robbery.   And there's no connection to that gun to anything in this robbery.

There's been no suggestion of any identification or that they seized any guns and that any gun was identified.   And I think the prejudice—I think it should be not allowed because it's not probative, it's highly prejudicial, and there's no connection.   They can't make a nexus of it.

THE COURT:  Was this gun shown to any of the victims?

MR. CAMPBELL:  No, sir.

THE COURT:  No picture of the gun?

MR. CAMPBELL:  No, sir.

THE COURT:  Why not?

MR. CAMPBELL:  I don't know why.  It was proceeded on, turned out to be a stolen firearm.  And he admits later in an interview to possessing a firearm scene at the scene of it.  So I mean, that's—

THE COURT:  At the scene of what?

MR. CAMPBELL:  The robbery.

THE COURT:  Does he admit it's this gun?

MR. CAMPBELL:  I don't know—

MR. EAGEN:  No.

MR. CAMPBELL:  I don't know, sir.

MR. EAGEN:   And I would argue that what he says in his statement is a little different, but that's—and they recorded the statement and they don't have that recording here either.

But that's neither here nor there at this point.  I'm more concerned with this gun coming in at this point.

THE COURT:  Well, it seems the connection with the gun is pretty flimsy.

MR. CAMPBELL:  I'll exclude it.  That's fine.

THE COURT:  If a picture was shown to the victim and they say it looks like it or something like that, that would be one thing.  But just the fact that it's a semi-automatic seems to me a little sketchy.

MR. CAMPBELL:  I'll go ahead and I won't bring that in.  But I am going to need to approach my witness and tell him that.

MR. EAGEN:  I think that's fine, yes, because I don't want this to end in a mistrial.

(Ex. E at 102–06).

Officer Doug Clark testified that he was dispatched to 2616 Mission Road on November 24, 2008, regarding a possible suspect in an armed robbery (Ex. E at 106–12).  Clark testified that dispatch provided a description of the suspect as a black male wearing a black skull cap and tan sweater.  Officer Clark testified that he made contact with the suspect, and he identified Petitioner in court as the person with whom he made contact.  Clark testified that after his contact with Petitioner, Petitioner was

released.  Officer Clark testified that later that day, he made contact with Petitioner at 2617 Mission Road, across the street from his earlier contact.  Clark testified that he brought Petitioner to the police station to meet with Investigator Beck.

Investigator Vincent Boccio testified that he interviewed Petitioner at the police station on November 24, 2008 (Ex. E at 113–20).  Boccio testified that prior to the interview, he read Petitioner a written Statement of Rights, which Petitioner then signed.  The Statement of Rights was admitted into evidence as State's Exhibit 2.  Investigator Boccio described Petitioner's statements during the interview as follows:

> Q [by the prosecutor].  During your conversation with him, did you all talk about the armed robbery that had happened at The Timbers on November 23?
>
> A.  Yes.
>
> Q.  Did he indicate that he was there?
>
> A.  Yes.
>
> Q.  What did he say about his involvement there?
>
> A.  He said he went over there.  He thought it was a drug deal going to be conducted.  He said it was set up by a black male named Matt.
>
> Mr. Smith said he was handed some US currency to go make contact with the victim at the front door.  Once he knocked on the door and the victim stepped out, three individuals came around the corner and the armed robbery took place.

Q.  Did he indicate he arrived with the people who had conducted the armed robbery?

A.  Yes.

Q.  And did he indicate some street names for each of these other people who he committed the armed robbery with?

A.  Yes, he did.

Q.  During your investigation, were you trying to find out everybody involved?

A.  That's correct.

Q.  Were y'all trying to track down some street names to real identification names?

A.  Yes, sir.

Q.  He admitted to being there, but he said he was just there to buy dope?

A.  That's correct.

Q.  Did you talk to him about whether or not he was armed during this robbery?

A.  Yes, I did.

Q.  What did he say about that?

A.  He said he was not.

Q.  Did he say whether or not he had a handgun when he talked to you?

     A.  For this particular incident, he did not have a handgun.

     Q.  Did he admit to seeing handguns pointed at the victims on the ground?

     A.  Yes, he did.

     Q.  Did he agree he had left the scene with the victims—I mean with the other perpetrators?

     A.  That's correct.

(Ex. E at 117–19).

Investigator Scott Beck testified that he prepared photographic line-ups to display to the victims of the robbery (Ex. E at 121–34).  Beck testified that he used computer resources to compile photographs of individuals with similar physical characteristics.  Beck testified that he chose some of the photographs based upon the name provided by Petitioner to Investigator Boccio.  Beck testified that prior to showing the line-ups to each of the victims, he told each of them that the person who committed the crime may or may not be in the photographs.  Beck identified State's Exhibit 1 as the photographic line-up that he showed to Kris Hekaros, and the exhibit was admitted into evidence.  Investigator Beck testified that Mr. Hekaros immediately indicated that he recognized one of the people in that line-up, and placed his initials near that photograph.  Beck testified that the photograph selected by Hekaros was

Petitioner's photograph.  Beck testified that Kris Hekaros identified a photograph from a different line-up, and that photograph was of a person named Mack Smith. Investigator Beck testified that he showed Paul Mazzei photographic line-ups, one of which included Petitioner's photograph, but Mazzei did not identify anyone from that line-up.  Investigator Beck testified that Kris Hekaros was the only victim who was able to positively identify any suspect from the photographic line-ups.  Beck testified that Kyle Abraham pointed to Petitioner's photograph, but said that he was not positive about the identification.

The jury heard no evidence that Petitioner was in possession of a gun after November 23, 2008, the night of the robberies.

During the court's final instructions to the jury, the court instructed the jury on the elements of robbery with a firearm (Ex. E at 150–67).  The court also instructed the jury on the principal theory of liability, and the independent act theory.[4]  The court

---

[4] These instructions were as follows:

If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if, one, the defendant had a conscious intent that the criminal act be done and, two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit the crime.

To be a principal, the defendant does not have to be present when the crime is committed.

instructed the jury that the case must be decided only upon the court's instructions and the evidence heard from the testimony of the witnesses and seen in the form of the exhibits admitted into evidence (*id.* at 164).  The court again reminded the jury that "what the attorneys say is not evidence" (*id.* at 167).

During closing arguments, neither attorney referenced Petitioner's possession of a gun after the night of the robberies.  Defense counsel reminded the jury, "[W]hat I say is not evidence.  What Mr. Campbell [the prosecutor] says is not evidence." (Ex. E at 177).  Petitioner's counsel argued that even though the evidence showed that Petitioner was at the Timbers on the night of the robberies, and that Kris Hekaros gave Petitioner his key, Petitioner was not involved in the robberies and was simply there to buy marijuana (*id.* at 177–85).

---

If you find the crimes alleged were committed, an issue in this case is whether the crimes alleged were an independent act of a person other than the defendant.  An independent act occurs when a person other than the defendant commits or attempts to commit a crime which the defendant did not intend to occur, in which the defendant did not participate, and which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.

If you find the defendant was not present when the crimes alleged occurred, that in and of itself does not establish that the crimes alleged were an independent act of another.  If you find that the crimes alleged were an independent act of another, then you should find the defendant not guilty of the crimes alleged.

(Ex. E at 159–60).

Turning to the post-conviction proceedings, Petitioner raised this IAC claim as Ground One in his Rule 3.850 motion.  The state circuit court held an evidentiary hearing, at which Petitioner's trial counsel, Attorney John Eagen, testified (Ex. Q at 148–51).  Eagen testified that he had been a criminal defense attorney for twenty-four years (*id.*).  He testified as follows with respect to Ground One:

> Q. [by counsel for the State].  Okay.  During my opening statement, I made a comment that he was found with a handgun.  Did you take notice of me making that comment?
>
> A.  I took note.  I didn't think it applied to—the mere mention of a handgun did not apply—was not, in my mind, or anybody's, I don't believe anybody's concern that, you know, it related to another crime. I mean, there are—you can have a handgun.  It doesn't mean you're committing a crime.  So it didn't you know, in my mind, I didn't see any problem with it.
>
> Q.  And did you wait until Witness Clark was called and bring it up at sidebar to make sure that I didn't expound upon that in any way to the prejudice of your client?
>
> A.  I did.
>
> Q.  And are you very familiar with Judge Hankinson's court concerning sidebars?
>
> A.  I am very familiar with it; yes, sir.
>
> Q.  And based on your experience in this case and others, does he do sidebars on the opposite of the courtroom with the tone in a manner that prohibits the jury from hearing the discussions of Court and counsel?

A.  He does.

Q.  Okay.  And in this case, did you insure and was there a conversation at sidebar where I was restricted, and I voluntarily withdrew any mention of him being found with a semiautomatic handgun in the days after this crime.

A.  Yes, there was.  I argued that basically there was no nexus between this gun and the crime.  It was never shown to the victims.  It was never identified by them.  The judge agreed with my argument and you were barred from bringing it up in the—through Officer Clark.

Q.  And as such, other than the victims of the robbery who allegedly saw the defendant with a gun during the robbery, did you successfully keep law enforcement from being able to say hey, he was found with a gun when we caught him?

A.  I did.

Q.  And other than what was said at sidebar and my opening, were you successful at keeping out of the jury's ears, any mention from a witness that the defendant was found with a handgun?

A.  Yes, sir.

(Ex. X at 262–63).

Attorney Eagen testified as follows on cross-examination:

Q.  Then let's back up to the point of the motion in limine.  Do I understand your testimony correctly that you did not intend for the motion in limine to address the firearm issue at that point?

A.  It was a very general motion in limine, and it was to avoid the mention of crimes not charged in the information and any criminal history.

Q.  Okay.  And as I understood your earlier testimony, you did not object to Mr. Campbell's opening statement or remarks related to Mr. Smith having been—Officer Clark makes contact with the defendant and finds him in possession of a semiautomatic pistol?

A.  No, I did not.

Q.  Okay.  And as I understood your testimony, you did not make that objection because you didn't see anything harmful about that because it wasn't illegal for Mr. Smith to be in possession of a firearm?

A.  Yes.  And not only that, an opening statement, as the court instructs the jury, and I usually make a point of reiterating in my opening statement, is not evidence.  We often say in opening statement, you'll have this, this and this before you.  Sometimes it happens, sometimes it doesn't.  But I didn't see any issue with the gun.  And I think if I had objected at that point and brought more attention to the fact of the gun—you know, sometimes if you object you reinforce in the jury's mind something that they may not even have been paying close attention to.

Q.  Okay.  You would agree with me though that you must have then changed your mind about the importance or the seriousness of that gun being associated with Mr. Smith from the point of Mr. Campbell's opening statement then to the point of bringing it to the Court's attention at sidebar?

A.  Oh, yes, it did change.

Q.  Do you know what changed your mind about that?

A.  I just think it was part of the testimony and evidence to be set forth at trial.  Once he—once we got into the trial and the issues came out, I think I found it more necessary to move for a sidebar and keep that gun, or mention of a gun out of the ears of the jury.

. . . .

But initially, I mean it didn't—it didn't give me any great pains or issues and I didn't see it as being harmful to my client.

. . . .

Q.  You would agree with me that the horse was kind of out of the barn at that point.  That once you realized that that might be damaging to your client, that Mr. Campbell had already made that statement in opening statements; correct?

A.  Well, he made a statement about a handgun in opening, yes.

. . . .

But I don't think—like I said, I don't think it was brought in—it never came into evidence, a semiautomatic or any other type gun that Mr. Smith had in his possession when he was apprehended by Officer Clark.

(Ex. X at 271–74).

At the conclusion of the evidentiary hearing, the court stated its reasons for

denying this IAC claim:

THE COURT:  Well, let me just say, I deny the motion for post-conviction relief specifically as to Ground 1.  I was the trial judge. When it was mentioned that we were keeping out other criminal activity, I did not envision the possession of a firearm being other criminal activity.  And I think if you look at the argument that was made by Mr. Eagen, it was not an other criminal acts objection, it was a relevance objection.  They're two different things.  I didn't ever rule on the objection frankly.  I kind of indicated what my leaning was.  And then the state withdrew mention further of the firearm, though it's a little bit left open.  But it was certainly not covered by the motion in limine, in my view.

In terms of being ineffective assistance of counsel, a failure to object to Mr. Campbell's comment in opening statement, I don't find that was ineffective.  Whether it was erroneous to make that comment or not,

I guess, you know, could have some debate on it.  Possession of a firearm by itself is not illegal, it's not other criminal activity, it's not particularly prejudicial.  You know, most people here on our juries are quite experienced with firearms.  They're not freaking out because somebody has a firearm.

Mr. Eagen testified he made a strategic decision not to object.  I don't find that's an unreasonable decision.  Even more clearly, the defendant was not prejudiced by that.  To say he had a gun, you know, he had a gun.  That doesn't prove he did or did not do the crime.  It's not overly prejudicial to simply have a gun.  Clearly, he was not prejudiced by that simple mention in opening statement about him having a gun.  I deny that claim.

(Ex. X at 281–82).  The circuit court adopted and incorporated its oral findings into its written decision denying Petitioner's Rule 3.850 motion (Ex. Y).

Petitioner argued this IAC claim on appeal to the First DCA (Ex. AA at 8–10).  The First DCA affirmed the lower court's decision without written opinion (Ex. CC).  Where, as here, a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision.[5]  *See* Harrington, 562 U.S. at 98.  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could

---

[5] The Eleventh Circuit recently held that "when reviewing a state prisoner's petition for a writ of habeas corpus, federal courts need not 'look through' a summary decision on the merits to review the reasoning of the state trial court."  Wilson v. Warden, Ga. Diagnostic Prison, 834 F.3d 1227, 1230 (11th Cir. 2016).

disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See id.* at 102; *see also* <u>Gill</u>, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Here, the First DCA's rejection of Petitioner's IAC claim could have been supported by the theory that Petitioner failed to demonstrate he was prejudiced by Attorney Eagen's failure to object to the prosecutor's single comment, during opening statements, that the evidence would show that on the day after the robberies, Officer Clark found Petitioner in possession of a semi-automatic pistol.  The jury was repeatedly reminded that any comments by the prosecutor or defense counsel did not constitute evidence and thus could not be considered in determining whether the State had presented sufficient evidence of Petitioner's guilt.  The jury heard Petitioner's admission to Investigator Boccio that he went to the Timbers with several other men on November 23, 2008; that he was the person at Kris Hekaros' front door when Hekaros stepped outside his townhouse; that he was present when Paul Mazzei was

robbed at gunpoint by the other men; and that he left the Timbers with the men who robbed Mazzei.  The jury also heard:  (1) Kris Hekaros' testimony that the man who approached him outside his front door and took his key was armed with a gun, and put the gun to his stomach; (2) Chris Vogel's testimony that the man who approached Kris Hekaros outside his townhouse had a gun; and (3) Paul Mazzei's testimony that all of the men had guns.  It was also apparent to the jury, by the end of trial, that the prosecutor's prediction of the evidence during his opening statement did not come to fruition in some respects.

It is possible that fairminded jurists could disagree with the theory that Petitioner failed to satisfy the prejudice component of the Strickland standard; however, it is this potential for disagreement that precludes the federal court from granting habeas relief.  *See* Harrington, 562 U.S. at 786 ("A state court's determination that a claim lacks merit precludes habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."); *id.* (§ 2254(d) preserves the federal court's authority to issue the writ in cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents); *see also* Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1127 (11th Cir. 2012) (if, at a minimum, fairminded jurists could disagree about the

correctness of the state court's decision, the state court's application of Supreme Court precedent was not unreasonable, and AEDPA precludes the grant of habeas relief) (citing Harrington, supra); Johnson v. Sec'y, Dep't of Corr., 643 F.3d 907, 910 (11th Cir. 2011) (". . . only 'if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents' may relief be granted.") (quoting Harrington, *supra* ).  Therefore, the undersigned recommends denial of habeas relief on Ground One.

C.   Ground Three:  "Defendant was denied due process by prosecution counsel [sic] presenting known false testimony via State's witness.  In essence State committed a Giglio violation.  14th Amend. U.S.C.A."

Petitioner alleges the prosecutor knowingly presented false testimony of Officer Clark, in violation of Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (ECF No. 1 at 9; ECF No. 25 at 6–9).  Petitioner alleges Officer Clark testified that he was dispatched to Petitioner's location pursuant to a 911 call, with a description of a suspect in the armed robberies.  Petitioner alleges the computer generated dispatch report ("CAD") produced during discovery, a copy of which Petitioner submitted to the state court, does not indicate that Officer Clark was dispatched (*see* ECF No. 25, Ex. A).  Petitioner asserts he presented this claim to the state courts in Ground Two of his Rule 3.850 motion (ECF No. 1 at 9).

As with Ground Two, *supra*, Respondent states that "it appears" that Petitioner

satisfied the exhaustion requirement; however, "[i]n an abundance of caution," the

State does not concede or waive the exhaustion defense (ECF No. 18 at 34 n.8).

Respondent contends the state court's adjudication of the claim was not contrary to

or an unreasonable application of clearly established federal law (ECF No. 18 at

34–36).

      1.     Clearly Established Federal Law

Giglio error is a species of Brady error,[6] that occurs when "the undisclosed

evidence demonstrates that the prosecution's case included perjured testimony and

that the prosecution knew, or should have known, of the perjury."  United States v.

Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).  "If false testimony

surfaces during a trial and the government has knowledge of it, . . . the government

has a duty to step forward and disclose."  Brown v. Wainwright, 785 F.2d 1457, 1464

(11th Cir. 1986).  "In order to prevail on a Giglio claim, a petitioner must establish

that the prosecutor knowingly used perjured testimony, or failed to correct what he

---

[6] In Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment."  373 U.S. at 87.

subsequently learned was false testimony, and that the falsehood was material."

Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999).

The origins of the Giglio doctrine lie in the Supreme Court's decision in Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), which held that a prosecutor's failure to correct false testimony by the principal state witness that he had received no promise of consideration in return for his testimony violated the defendant's Fourteenth Amendment due process rights and required a reversal of the judgment of conviction.  The Court explained that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  *Id.*, 360 U.S. at 269 (citing Mooney v. Holohan, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935)).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id.*  This principle, the Supreme Court observed, "does not cease to apply merely because the false testimony goes only to the credibility of the witness," since "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  *Id.*  In Napue, the Supreme Court held that reversal was

required because "the false testimony used by the State in securing the conviction may have had an effect on the outcome of the trial." *Id.* at 272.

Subsequently, in Giglio, the Supreme Court held that the government's failure to correct false testimony that its key witness (the defendant's co-conspirator) had received no promise of nonprosecution in exchange for his testimony, as well as the prosecutor's false statement to this effect in closing argument, required that the defendant be granted a new trial. The Court explained that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." 405 U.S. at 153 (citation and internal quotation marks omitted).

The Giglio Court made clear, however, that such errors do not require automatic reversal, and articulated a "materiality" standard to guide the determination of whether a new trial is warranted:

> We do not . . . automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under Brady. A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."

*Id.* (quoting Napue, 360 U.S. at 271). Because the Government's case in Giglio "depended almost entirely on [the falsely testifying witness's] testimony," the Court

reasoned, his "credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."  *Id.* at 154–55. Accordingly, the Court reversed Giglio's conviction.

Since its decisions in Napue and Giglio, the Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside *if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury*."  Agurs, 427 U.S. at 103 (footnote omitted) (emphasis added); *see also* Kyles v. Whitley, 514 U.S. 419, 433 & n. 7, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); United States v. Bagley, 473 U.S. 667, 677, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

The "any reasonable likelihood" standard differs from the materiality standard applicable to other types of Brady violations because of the nature of the error.  As the Supreme Court has explained, "the Court has applied a strict standard of materiality [to Giglio violations], not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process."  Agurs, 427 U.S. at 104.

2.     Federal Review of State Court Decision

Petitioner raised this Giglio claim as Ground Two of his Rule 3.850 motion (Ex. Q at 151–55).   Petitioner submitted several documentary exhibits in support of Ground Two (id. at 183–93).   He submitted defense counsel's pre-trial discovery requests, which included (1) a request, dated April 9, 2010, for "all copies of 911 call [sic] related to this case"; and (2) a request, dated  January 24, 2011, for the "CAD Notes" and other documentation maintained by the Tallahassee Police Department for the date of the robberies and the date following the robberies (id. at 185–86, 191–92).

With regard to the first discovery request, Petitioner submitted the State Attorney's request to the Tallahassee Police Department to provide him a copy of any 911 calls in Petitioner's case (Ex. E at 193).   With regard to the request for "CAD Notes," Petitioner submitted the State Attorney's Amended Answer to Demand for Discovery, with attached "CAD notes" (id. at 187–90).   The "CAD Notes" consist of a Detailed Incident Summary from the Tallahassee Police Department.   The Detailed Incident Summary describes the event as "robbery in progress" at "792 Timberwood Cir. E."   The Summary indicates that the event was "created" on 11/23/2008 at 20:47:37, and "closed" on 11/24/2008 at 4:11:25.   The Summary identifies several officers, indicates the date and time that some officers were dispatched, and indicates

the date and time that some officers were "cleared."   Officer Doug Clark is not

identified on the list.

The testimony which is the subject of the alleged <u>Giglio</u> violation is the

following trial testimony:

Q.  Calling your attention to November 24 of 2008, were you dispatched to the area of 2617, 2616 Mission Road?

A.  Yes, sir.

Q.  Are there any apartment complexes there?

A.   Stratford Landing apartment complex is located at 2616 Mission Road, which is where we were dispatched to.

Q.  Is there another apartment complex, Mission Trace, in close proximity?  Or Mission Landing?

A.  There are several between White Drive, San Luis Drive—San Luis Road, all along there.

Q.  Okay.  And once there, were you given a description of a possible suspect in an armed robbery?

A.  Yes.

Q.  And do you recall what that description was?

A.  Yes, sir.  Specifically given by dispatch and what was sent to us on our computers was a black male wearing a black skull cap, a tan sweater.

Q.  Did you find such a person matching that description at that residence?

A.  We did.

Q.  And did you make contact with that person?

A.  Yes, sir.

. . . .

Q.  Okay.  Officer, after first making contact with him and having that interaction, was he eventually released?

A.  Yes, sir.

Q.  Okay.  Later in the day, did you go back and make contact with him a second time?

A.  At 2617 Mission Road, which would have been directly across the street.

Q.  Same basic spot except across the street?

A.  Yes, sir.

Q.  And once again, was he dressed the same way?

A.  I don't recall if he was dressed the same way.  But, you know, at that point we knew who he was, recognized him and—

Q.  Okay.  And at that point, did you bring him to Tallahassee Police Department to meet with Investigator Beck?

A. Yes, sir, we were able to detain him, arrest him, and bring him back to the station for Investigator Boccio and Beck, yes.

(Ex. E at 107–08, 110–11).

At the post-conviction evidentiary hearing, Petitioner testified that Officer Clark lied during trial when he testified that he was dispatched by 911 to Mission Road, and Clark also lied in the Arrest/Probable Cause Affidavit, when he stated that he was dispatched by 911 to Mission Road (Ex. X at 239–45, 253–55).  Petitioner testified that the falsity of Officer Clark's testimony was demonstrated by the fact that Officer Clark was not mentioned in the "CAD Notes" provided to defense counsel during discovery (*see* Ex. E at 245).

Notably, neither Officer Clark's trial testimony nor the Probable Cause Affidavit (prepared by Investigator Beck) mentioned that Clark's presence on Mission Road was the result of a 911 call (*see* Ex. B, Ex. E at 107–08, 110–11).

Attorney Eagen testified regarding this issue at the post-conviction evidentiary hearing as follows:

> A.  My understanding is that CAD notes, and I believe they stand for computer assisted dispatch, or something of that nature, they are not inclusive of all dispatch calls that are made.  They are basically—I mean, they don't cover every single call.  They just don't.  I don't find them to be that helpful, period.  But on the request of my client, we did secure them.  And there is—I will agree that there's nothing mentioned of Officer Clark going or being dispatched to the scene, but then there's no evidence that he wasn't dispatched to go to the scene.  So—
> . . . .
> Q.  Okay.  Have you found cases where officers communicate by cell phone in the past?

A.   There is any number of ways to communicate between officers, and other officers, and officers and the police department.  Like I said earlier, CAD notes are not what I would say as helpful as some people believe they are.

Q.  Okay.  Did you have any evidence during the trial to impeach Officer Clark concerning the veracity of his responding to this case and having a description like he said he did?

A.  No, I did not.  In fact, he was—the crime had occurred I think the day before.  And the 911 call was made by the victims giving a general description.   Officer Clark, during the course of this investigation, would have had that information, I mean.  So there was nothing to impeach him about on that issue.

Q.  Have you, over the course of your 24 years, had witnesses lie in the past?

A.  Law enforcement officers?

Q.  Any witnesses.

A.  Any witnesses?  I think witnesses sometimes stretch the truth as far as they can go without breaking.

Q.  Okay.  And have you effectively impeached them and shown them to be stretching the truth or otherwise not being candid with the jury?

A.  Absolutely.

Q.  If you felt at the time that you had a good cause to call into question his veracity, would you used whatever tactics to show that you're [sic] not telling the truth?

A.  Absolutely.

Q.  Based on the information at trial, did you believe that Officer Clark was perjuring himself?

A.  No, sir.

Q.  Okay.  Based on the information, did you believe that I was suborning perjury from Officer Clark?

A.  No, sir.

Q.  As a member of the Bar, are you ethically required to report to the Bar, the court or otherwise, if you found me to be suborning perjury or putting on false testimony?

A.  If I thought there was any issue in your question or his answer, I would have requested a sidebar and I would have pursued it with the court.

Q.  Sitting here today some years later, is there any reason that you're now aware of to believe that Officer Clark was either lying or that I was inducing perjured testimony through my direct?

A.  No, sir.

(Ex. X at 264–66).  On cross-examination, Attorney Eagen testified that he had no reason to believe that during Officer Clark's trial testimony, Clark misrepresented how he became involved in the case (*id.* at 273).  Eagen testified that his reading of the discovery materials (which included the "CAD Notes" and the Probable Cause Affidavit), was that Officer Clark's responding to Mission Road on the day after the

robberies was part of the ongoing investigation from the initial 911 call that occurred the night before (*id.*).

At the conclusion of the evidentiary hearing, the court stated its reasons for denying the IAC claim:

> THE COURT:   Ground 2, due process violation, knowing presentation of perjured testimony.  First, Mr. Smith has not proven that anything untruthful was said.  There's nothing in the transcript that says anything untruthful.  What Officer Clark says is he was dispatched to the scene.  There is a total absence of proof that that was untrue that he was—I think it's more likely than not he was dispatched to the scene.
>
> The description, as I read it, was a description that was gathered the day before.  The fact that the CAD notes don't specifically show a dispatch on November 24th, certainly doesn't—sit down, sir.  Have a seat so—it's rude, Mr. Smith.
>
> (Brief pause)
>
> THE COURT:   I politely listened to you, Mr. Smith, I think you can sit and politely listen to me.  I don't appreciate your actions.  Anyway, there was no showing that there was any perjured testimony.  It is such a minute issue anyway, there certainly—I mean, I can't even imagine how it was even of an issue for the jury to consider.  I deny that claim.  There's been no due process violation shown.

(Ex. X at 282–83).  The circuit court adopted and incorporated its oral findings into its written decision denying Petitioner's Rule 3.850 motion (Ex. Y).

Petitioner argued this IAC claim on appeal to the First DCA (Ex. AA at 10–12).

The First DCA affirmed the lower court's decision without written opinion (Ex. CC).

On federal habeas review, this court must presume the correctness of the state court's factual findings unless Petitioner rebuts the presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  Petitioner has failed to rebut, with clear and convincing evidence, the state court's finding that Officer Clark's testimony was not untruthful.[7]  In light of this factual finding, the state court's denial of Petitioner's due process claim was not contrary to, or an unreasonable application of, <u>Giglio</u>.  Petitioner is not entitled to federal habeas relief on Ground Three.

   D.   <u>Ground Four:  "Ineffective assistant [sic] of counsel for failure to challenge pre-trial the State's misconduct of suggestive (undue) action in</u>

---

   [7] The court notes that Petitioner submitted several exhibits with his reply (*see* ECF No. 27). With the exception of the Tallahassee Police Department Detailed Incident Summary (i.e., the "CAD Notes"), none of those exhibits were part of the state court record.  In <u>Cullen v. Pinholster</u>, 563 U.S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), the Supreme Court held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) <u>on the record that was before that state court</u>."  563 U.S. at 185 (emphasis added). "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review."  *Id.*  <u>Pinholster</u> presents "a clear, emphatic rule:  if a state court has adjudicated the claim on the merits, then a petitioner must satisfy § 2254(d)(1) based only on the record before that state court."  <u>Pope v. Sec'y, Fla. Dep't of Corr.</u>, 752 F.3d 1254, 1263 (11th Cir. 2014), *cert. denied sub nom* <u>Pope v. Jones</u>, 135 S. Ct. 1550, 191 L. Ed. 2d 643 (2015).  Thus, as a general rule, district courts may not expand the record or conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d).  *See* <u>Frazier v. Bouchard</u>, 661 F.3d 519, 528 (11th Cir. 2011) (limiting review under § 2254(d)(1) to record before state court, and refusing to consider expanded record presented to district court).

   Here, Petitioner's <u>Giglio</u> claim was adjudicated on the merits in state court; therefore, Petitioner must satisfy § 2254(d)(1) on the record that was before the state court.  The undersigned thus did not consider any of Petitioner's exhibits that were not included in the state court record.

identification  process.    (Witness  Paul  Mazzei  revealed  how  he  ultimately
identified Defendant.)"

Petitioner  alleges  that  his  defense  to  the  armed  robbery  charges  was
misidentification (ECF No. 1 at 11–12).   He alleges during the "initial photo
identification process," Paul Mazzei did not identify him.  Petitioner alleges  during
Mr. Mazzei's pre-trial deposition, Mazzei testified that "they" sent him photographs
in the mail with the name "John Smith" printed on the photos and a note stating, "This
is the guy who robbed you."  Petitioner alleges based upon "their" conduct, which
Petitioner attributes to either law enforcement or the State Attorney's Office, Mr.
Mazzei identified Petitioner in court as one of the armed robbers.  Petitioner alleges
he  presented  this  claim  in  his  Rule  3.850  motion,  but  the  state  court  failed  to
determine the issue of the "unduly suggestive misconduct" of law enforcement or the
State Attorney's Office (*id.* at 12).

In Petitioner's reply, he argues that the state court incorrectly identified his
claim as based upon defense counsel's failure to challenge Mr. Mazzei's in-court
identification; whereas, Petitioner's claim was actually "the suggestive nature of the
in-court identification, and the fact that counsel should have suppressed this" (ECF
No. 25 at 9–10).  Petitioner argues defense counsel was ineffective for failing to move
to suppress Mr. Mazzei's in-court identification because it was gained through the use

of an impermissibly suggestive method (*id.* at 10).  Confusingly, Petitioner states, "Throughout the postconviction proceedings the courts have consistently addressed this matter on the merits as raised by the Petitioner.  This court has the authority to address this matter on the merits as the lower court's [sic] have not." (*id.*).

Respondent contends the sole issue that Petitioner presented to the state circuit court, and which the state court adjudicated on the merits, was that defense counsel should have moved to suppress Mr. Mazzei's in-court identification on the ground that Mazzei had previously identified the wrong person from a photo line-up (ECF No. 18 at 42–44).  Therefore, only that claim was exhausted (*id.* at 43 & n.11).  Respondent contends that not only did Petitioner fail to mention Mr. Mazzei's pre-trial deposition at the post-conviction evidentiary hearing, but also that he made no complaint to the circuit court about its alleged "failure to entertain-address the correct facts as raised by Petitioner" by filing a motion for rehearing pursuant to Rule 3.850(h) and no mention of such in his initial brief on appeal before the First DCA, which was the proper procedure for doing so under Florida law (*id.* at 43).  *See* Armstrong v. State, 642 So. 2d 730, 740 (Fla. 1994) (it is the movant's burden to secure rulings on his or her motions); Caratelli v. State, 832 So. 2d 850, 856 (Fla. 4th DCA 2002) ("A plethora of Florida cases support the notion that a party must obtain a ruling from the trial court

in order to preserve an issue for appellate review); <u>Schreidell v. Shoter</u>, 500 So. 2d 228, 233 (Fla. 3d DCA 1986) (observing that "failure to secure a ruling on an objection waives it, unless the court deliberately and patently refuses to so rule"). Respondent contends the state court's adjudication of the IAC claim presented by Petitioner in the state court proceedings was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of <u>Strickland</u> (<i>id.</i> at 44–47).

The state court record demonstrates that in Ground Four of Petitioner's Rule 3.850 motion, Petitioner argued that defense counsel was ineffective for failing to file a pre-trial motion to "suppress" or preclude any in-court identification by Mr. Mazzei, on the ground that any such identification was the product of unduly suggestive procedures and thus unreliable (Ex. Q at 157–61). Petitioner alleged that shortly after the robbery, Mr. Mazzei was shown a photo line-up that included Petitioner's photo, and Mazzei was unable to positively identify anyone from the line-up as a participant in the robbery. Petitioner alleged that Mr. Mazzei was subsequently shown another photo line-up. Petitioner alleged Mazzei identified a person from the line-up, but it was not Petitioner; instead, it was a man named Alexis Frantz. Petitioner alleged that during Mr. Mazzei's pre-trial deposition, Mazzei stated that he received documents

in the mail which identified the man who robbed him as John Smith.  Petitioner

alleged that Mazzei also stated in his deposition that the robber was bald and had a

scar under his eye; however, Petitioner did not have any scars on his face and had

dreadlocks.  Petitioner alleged that it was unduly suggestive to inform Mr. Mazzei

prior to trial that the robber's name was John Smith, and this tainted Mazzei's in-court

identification.  Petitioner alleged that defense counsel should have anticipated the

prejudicial effect of an in-court identification, and filed a pre-trial motion to preclude

it.

Petitioner did not submit Mr. Mazzei's pre-trial deposition in the Rule 3.850

proceedings, nor was it included in any part of the state court record.  At the post-

conviction evidentiary hearing, Petitioner testified that he believed that Attorney

Eagen should have brought to the jury's attention the fact that Mr. Mazzei picked out

someone other than Petitioner in the photographic line-up (Ex. X at 245–47).  Upon

cross-examination by the State, Petitioner testified as follows:

> Q.  Ground 4 concerns the lineup.  You feel that your—your
> lawyer brought out the fact that one of the victims picked somebody else
> out and identified them as John Smith; 2 isn't that right?
>
> A.  I don't know who he identified them as.  He picked out—he
> circled a guy's name.  He circled a guy and it wasn't me.

Q.  One of the victims came into court and pointed at you and said you robbed him, didn't he?

A.  Yes, sir.

Q.  Okay.  And your lawyer got up and say hey, back when this happened, you picked out somebody else other than that guy, didn't he?

A.  Yes, sir.

Q.  Okay.  And it's your testimony today that was bad lawyering?

A.  Yes, sir.

Q.  How?

A.  Because if you—okay.  The crime—if you picked out the police report saying that—okay, when the crime happened, the next day they showed them photo lineups.  Okay.  They show you a photo lineup, you just got robbed at gunpoint, somebody right in front of you, right there, and they show you a lineup and you circle somebody, and then two years later you come in and the guy that's sitting there ain't the guy that you circled just less than 24 hours, something ain't right.  I mean, how can he say I robbed him but then he circle somebody else?

(Ex. X at 255–57).

Attorney Eagen provided the following testimony on this issue:

Q.  Going to Ground 4, concerning identification.  In this case, was there the allegation of multiple co-defendants taking part in this robbery?

A.  Yes, there were.

Q.   Okay.   And were there also multiple victims or people involved as far as in and outside the apartment during the robbery?

A.  Also, yes.

Q.  Okay.  Concerning the lineup, did one of the alleged victims identify somebody other than your client as being Mr. Smith?

A.  They did.

Q.  Was that good for you?

A.  That's very good for me.

Q.  Okay.  Why is that good for you?

A.  Because it shows inconsistency with the identification process.

Q.  Under the U.S. Constitution, does your client have a right to be present in court throughout the trial?

A.  Absolutely.

Q.  Have you ever suggested that your client should voluntarily absent himself from the courtroom during a trial?

A.  No, sir.

Q.  Was there anything that you could do to stop me from asking the victim whether he could identify the defendant as being one of the robbers during the trial?

A.  No, I couldn't.  The only thing I could do is, and what I did was in cross-examination attack that inference by showing that that witness, although they had pointed to Mr. Smith, picked out somebody

else entirely.  I mean, I crossed and brought that out during the cross-examination to my understanding, as I recall.

Q.  In your 24 years of criminal practice, are you aware of any evidentiary or procedural bar from asking a witness if they can identify the defendant as the person who committed the crime?

A.  I don't know of any.  I mean, I always—you know, in every trial I've ever done, at some point the State says, do you see the man, blah, blah, blah, and they point to the defendant.  Now, they do it—what weight the jury gives that identification, I can't say.  But, I mean, it happens all the time.  And I don't think I can keep the State from doing that.

(Ex. X at 266–68).

Petitioner's post-conviction counsel briefly cross-examined Attorney Eagen:

Q.  Okay.  I think that we've adequately addressed the suggestive lineup issue.  That was a circumstance that you had a victim who inconsistently who made inconsistent identifications, one out of court and one in court?

A.  Uh-huh.

Q.  And you were able to bring that to the attention of the jury?

A.  Yes, sir.

(Ex. X at 274).

At the conclusion of the evidentiary hearing, the court stated its reasons for denying the IAC claim:

     THE COURT: Ground 4, ineffective assistance of counsel, failure to suppress the identification.  I guess he's talking about the in-court identification.  I don't find there's any basis to support the in-court identification [sic].  Frankly, Mr. Eagen did an admirable job in this case of getting the victim to acknowledge that he had picked out somebody else in a lineup.  There was no prejudice.  There was no ineffective assistance of counsel.  That claim is denied.

(Ex. X at 283).  The circuit court adopted and incorporated its oral findings into its written decision denying Petitioner's Rule 3.850 motion (Ex. Y).

In Petitioner's initial brief on appeal, Petitioner argued that the lower court erred by denying his IAC claim based upon defense counsel's failure to move to suppress or otherwise preclude Mr. Mazzei's in-court identification on the ground that it was tainted by an improperly suggestive pre-trial procedure (Ex. AA at 12–15). Petitioner argued that prior to trial, Mr. Mazzei was unable to identify him in a photo line-up, and Mazzei's description of the robber did not match Petitioner's physical appearance (*id.*).  Petitioner argued that during defense counsel's cross-examination of Mazzei, Mazzei admitted that he was unable to identify Petitioner from a photo line-up.  Petitioner argued that Mazzei's testimony that "John Smith" was one of the robbers, and Mazzei's in-court identification of him as one of the robbers, were both products of unduly suggestive identification procedures (i.e., law enforcement's

providing Petitioner's name to Mazzei prior to trial) (*id.*).  The First DCA affirmed the lower court's decision without written opinion (Ex. CC).

Ground Four of Petitioner's § 2254 petition presents the same claim he presented as Ground Four of his Rule 3.850 motion—defense counsel was ineffective for failing to file a pre-trial motion to preclude the State from offering Mr. Mazzei's in-court identification of Petitioner.  Petitioner's contention that, despite his presenting his claim to the state courts, the state courts did not adjudicate the merits, is without merit.  Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits."  *See* <u>Richter</u>, 562 U.S. at 99.  When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Id.*  The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely.  *Id.* at 99–100.  The same rule applies when the state court addresses some but not all of the federal claims raised by a defendant.  When a federal claim has been presented to the state court, and

the state court opinion addresses some but not all of defendant's federal claims, a rebuttable presumption arises on federal habeas review that state court adjudicated all of the federal claims on the merits. *See* Johnson v. Williams, — U.S. —, 133 S. Ct. 1088, 1094, 185 L. Ed. 2d 105 (2013).

Here, Petitioner has not rebutted the presumption that the First DCA adjudicated the merits of his IAC claim. Therefore, the First DCA's decision is subject to review under § 2254(d).

The First DCA's rejection of Petitioner's claim could have been supported by the theory that Petitioner failed to demonstrate a reasonable probability that the result of trial would have been different if Attorney Eagen had filed a pre-trial motion to preclude the State from offering Mr. Mazzei's in-court identification. Petitioner contends Attorney Eagen should have sought preclusion of any in-court identification by Mr. Mazzei on the ground that it was tainted by an improperly suggestive pre-trial procedure, specifically, the State's informing Mr. Mazzei that John Smith was one of the robbers.

In-court identification testimony may not be admitted when the police have obtained a pre-trial lineup identification in violation of defendant's right to counsel, or when police have obtained a pre-trial identification by means of an unnecessarily

suggestive procedure, unless the in-court identification is found to be reliable and based solely upon the witness' independent recollection of the offender at the time of crime, uninfluenced by the intervening illegal confrontation.  *See* Edwards v. State, 538 So. 2d 440, 442 (Fla. 1989) (citing United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); and Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967)).  One Florida court has held that an officer's conduct of providing victims with the defendant's name, which the victims used to locate and view the defendant's photo on the county sheriff's website before they had an opportunity to identify him, is unnecessarily suggestive, creating a substantial likelihood of irreparable misidentification and requiring exclusion of a pre-trial photo identification and an in-court identification of the defendant at trial.  *See* State v. Gomez, 937 So. 2d 828, 833 (Fla. 4th DCA 2006).

Here, Petitioner did not present the state court with any evidence that Mr. Mazzei's in-court identification originated from any illegal conduct by the police or

the prosecutor.  Petitioner made allegations of misconduct (i.e., that Mazzei testified

in his deposition that he received mail from either the police or the prosecutor's office

stating that John Smith was one of the robbers), but Petitioner never submitted a

transcript of Mazzei's deposition or any other evidence substantiating this allegation.

In the absence of any evidence that an in-court identification by Mazzei originated

from illegal conduct, the state court reasonably concluded that Petitioner failed to

demonstrate he was prejudiced by Attorney Eagen's failure to move to exclude

Mazzei's in-court identification.

Additionally, even if Attorney Eagen had a basis to seek preclusion of Mr.

Mazzei's in-court identification under Gomez, 937 So. 2d at 833, counsel's decision

to challenge the reliability of Mr. Mazzei's in-court identification during cross-

examination, and argue its reliability in closing arguments, was not a decision that no

competent counsel would have made.  During cross-examination of Mr. Mazzei,

Attorney Eagen question him about the fact that he did not identify Petitioner from

either of the photographic line-ups, and that he instead identified another person (Ex.

E at 73–75, 77–78; Ex. F2).  Indeed, Mazzei initially testified that he identified John

Smith in one of the photographic line-ups, but when defense counsel showed him the

line-up, he admitted that the person he identified was not Petitioner (Ex. E at 71–72,

74–75, 77; Ex. F2).  Attorney Eagen also elicited testimony from Investigator Beck that Mr. Mazzei did not identify anyone from the photographic line-up which included Petitioner's photograph (Ex. E at 127).   During closing arguments, Attorney Eagen argued to the jury that it defied common sense to believe that the witnesses' memories of the robbers' appearances improved from the time they were shown the line-ups just days after the robberies, to the time of Petitioner's trial three years later (*id.* at 180–81, 183–84).  Eagen urged the jury to reject the identifications as unreliable (*id.*).

Moreover, Mr. Mazzei's in-court identification was not the only evidence linking Petitioner to the robberies.  Investigator Boccio testified that Petitioner admitted he was present during the robberies.  Additionally, another victim, Kris Hekaros, identified Petitioner both in court and from a pre-trial photographic line-up as the person who put a gun to his stomach and took the key to his townhouse.  In light of this evidence, as well as defense counsel's eliciting testimony from Mr. Mazzei that undermined the credibility of his in-court identification, Petitioner failed to show that the state court unreasonably concluded that defense counsel's failure to seek preclusion of Mazzei's in-court identification prejudiced him in the Strickland sense.

Petitioner failed to demonstrate that the state court's adjudication of his IAC claim was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to federal habeas relief on Ground Four.

## IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 14<u>th</u> day of December 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

Case No.:  4:15cv374/RH/EMT

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.<u>  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**